# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT NASHVILLE
January 13, 2021 Session

## STATE OF TENNESSEE V. JOHN DENNIS GREEN

**Appeal from the Circuit Court for Rutherford County**
**No. 80760    Royce Taylor, Judge**

_____

### No. M2019-02197-CCA-R3-CD

_____

A Rutherford County jury convicted Defendant, John Dennis Green, of aggravated assault and domestic assault, for which the trial court imposed an effective three-year sentence. On appeal, Defendant contends that the trial court erred by failing to instruct the jury on self-defense and that the evidence was insufficient to support his convictions. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

John C. Taylor (on appeal) and Guy R. Dotson, Jr. (at trial), Murfreesboro, Tennessee, for the appellant, John Dennis Green.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Jennings H. Jones, District Attorney General; and John C. Zimmerman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## Factual and Procedural Background

*Trial testimony*

At trial, Adriana Graham testified that she began dating Defendant in 2013 and that she moved into Defendant's home on Moore Way in LaVergne in 2014. Ms. Graham explained that, in September 2018, she worked at Kindercare Learning Center, teaching autistic and special needs children and that Defendant worked at Bojangles as a cook and dishwasher. She stated that, when she first met Defendant, he told her that he worked for a sports talk radio station. She later learned, however, that Defendant "never worked for

them.  He actually was a call[-]in.  Someone that called to a radio all of the time to talk about sports."

Ms. Graham said that, on September 25, 2018, she received a pay raise and promotion at work.  Ms. Graham called Defendant as she drove home that evening.  She could tell by Defendant's voice that something was wrong and that he had been drinking.  Defendant told Ms. Graham that he was leaving TNT's, a bar on Nolensville Road, and that he was going to stop at a liquor store for a pint of whiskey on the way home.

Ms. Graham stated that, when she got home, she took a quick shower and then began preparing a meal.  She drank half of a glass of whiskey.  Defendant drank the remainder of the pint and then went to the liquor store to get another pint of whiskey.  She recalled that she and Defendant watched the finale of The Voice television show in their bedroom.  She explained that Defendant was "texting his boss back and forth" about things that were going on at his job and that Defendant "was pretty upset[.]"  Ms. Graham explained, "[Defendant] just felt unappreciated.  The fact that he was 50 years old . . . making less money."

Ms. Graham said that a disagreement started when Defendant took some Percocet with the alcohol he was consuming.  Ms. Graham recalled that dinner was done around 8:45 p.m. but that Defendant was in a "confrontation" on the phone with his boss and another employee.  She said that Defendant's plate of food was on the counter and that she told him dinner was ready.  Defendant then "smacked his hand[,]" and his plate of food fell to the floor.  Ms. Graham yelled at Defendant "for the plate being in the floor."  She told Defendant that she was leaving, but Defendant said that she was "not going anywhere."  Defendant turned over the kitchen table and began "screaming and hollering."  Ms. Graham said that the disagreement escalated quickly after she told Defendant that she was leaving and that Defendant "destroyed" the house.  She stated that they were "both spilling [their] emotions" and that they were both angry.  She said that "out of nowhere," Defendant began hitting her.

Ms. Graham stated that she tried to get her cell phone to call her sister and mom, who lived in Kentucky.  Defendant said that she was "not calling anyone," and he pulled her hair.  Ms. Graham testified that, as she attempted to get to her phone, Defendant hit and shoved her and then pushed her into a chair.  He held her down in the chair and put his hand on her throat, "crushing" her airway.  Ms. Graham explained that she was five foot, six inches and weighed 122 pounds and that Defendant was around five foot, ten inches and weighed 250 pounds.  She said that Defendant was putting all his weight on her.  Ms. Graham felt like she could not breathe and began kicking at Defendant.  She recalled that a picture frame had fallen off the wall into the chair and that Defendant was pressing her down in the glass.  Ms. Graham testified that she scratched Defendant on his neck and nose while trying to get him off her.  She said that Defendant bit her thumb, arm, and on her

face. She said that she wore makeup to cover the scars on her face from the bite. Ms. Graham said that she was able to get up out of the chair when their dog bit Defendant on the back of his leg.

Ms. Graham recalled that she ran out the front door and saw a neighbor sitting in his driveway. She screamed at the neighbor to call 911 as Defendant ran into the front yard behind her. Ms. Graham said that her phone was on the couch and that Defendant grabbed her phone from the couch and took it outside. Defendant started hitting her again, and the neighbor went inside. She said that Defendant dropped the phone when they were outside and that she picked it up and ran inside, locked the door, and called 911. She said that officers responded about two minutes later and that she did not move, throw, or "mess up" anything in the house prior to the officers' arrival. When asked if Defendant tried to prevent her from calling 911, Ms. Graham responded, "Yeah, that was the whole reason of us arguing and fighting and him strangling me is me trying to get the phone off of the couch to call 911."

Ms. Graham was taken to the police station where photographs of her injuries were taken. Ms. Graham identified photographs of the bite marks on her face, thumb, and arm and a photograph of marks caused by glass from the broken picture frame. She also identified a photograph of a mark on the top of her forehead where Defendant hit her. She explained that Defendant "always wore big gaudy rings on his fingers. So, I just think the ring got me in my head." Ms. Graham stated that she did not want to seek medical treatment because she did not have insurance to pay for it. She said that her mother and aunt picked her up around 3:00 a.m. They took her to Defendant's house, and she packed some of her things and went to Kentucky with her family members.

Officer Alex Chang with the LaVergne Police Department testified that he responded to a 911 call at Defendant's home on Moore Way. When he arrived on the scene, Officer Chang saw another officer speaking with Defendant on the front porch. Defendant was shirtless and had superficial scratches on his face and neck. Officer Chang testified that Defendant was uncooperative and appeared to be "highly intoxicated." He could smell alcohol on Defendant's breath, and Defendant had blood-shot eyes. Defendant was "very hyper" and "moving around a lot[,]" and he appeared to be angry.

Officer Chang stated that he went inside the residence and spoke to Ms. Graham, who was sitting in a chair by the front door. Ms. Graham was crying, and Officer Chang noticed injuries to her face. He saw that the residence was in disarray and observed a bottle of "hard liquor" in the kitchen. Ms. Graham told Officer Chang that Defendant was her boyfriend, that Defendant had been "drinking all day," and that he was upset because he was "arguing with his employer." Ms. Graham said that she told Defendant she did not agree with his arguing with his employer and that Defendant became "very upset." She reported that "[Defendant] . . . took the food that [she] had prepared for him. He threw it

at the ground, flipped the table over, and became very aggressive and started shoving her around." Ms. Graham told Officer Chang that Defendant prevented her from reaching her cell phone. Defendant "grabbed her by the hair [and]dragged her across the floor." He pushed her into the chair in the living room and hit her. She said that she hit Defendant in the face in an attempt to defend herself, and Defendant bit her thumb. Ms. Graham recounted that Defendant put his hands around her throat and "started squeezing until she almost lost consciousness." She said that the dog then bit Defendant in the back of the leg, causing Defendant to let go of her, and she ran out of the residence. Officer Chang stated that the injuries he observed on Ms. Graham were consistent with the story she told him.

When Officer Chang attempted to speak to Defendant, he observed that Defendant had minor puncture wounds on the back of his leg. Officer Chang recalled that Defendant said he had been a radio DJ named "Doctor Detroit." Defendant was uncooperative, and he was taken into an ambulance to be examined by paramedics. Officer Chang testified that he was inside the ambulance with Defendant when Defendant admitted to drinking and to mixing Percocet with the alcohol. Officer Chang said that because of this admission, Defendant was transported to the hospital for observation. Officer Chang testified that the Domestic Abuse Response Team (DART) responded to the police station to speak with Ms. Graham. He explained that DART was for victims of domestic violence and that the organization helped Ms. Graham obtain a restraining order against Defendant.

Officer Brandon Joyner of the LaVergne Police Department testified that he also responded to the 911 call at Defendant's residence. He recalled that other officers were outside speaking to Defendant, so he went inside and spoke to Ms. Graham. Officer Joyner said that the residence was "in complete disarray." He saw broken glass by the front door from a picture frame. Additionally, the kitchen table and chairs had been "flipped over." Officer Joyner recalled that Ms. Graham was crying and upset and that she was initially afraid to speak to him. Officer Joyner testified that Ms. Graham had visible injuries to her face. Ms. Graham told Officer Joyner that a verbal argument began but escalated and became physical when Defendant grabbed her by the hair and put her down on a chair. She said that Defendant got on top of her and started hitting her in the face. Defendant then put his hands around her neck, causing her to "almost [lose] consciousness." Ms. Graham said that the dog bit Defendant on the leg and that Defendant let go of her. Defendant then "grabbed the picture frame off of the wall and threw it at the dog." Officer Joyner testified that the inside of the residence matched Ms. Graham's description of what had occurred.

Officer Joyner said that he went to the hospital to wait for Defendant's release so that he could transport Defendant to jail. While transporting Defendant, Defendant "kept repeating . . . [']you don't know who you are messing with. I'm . . . Doctor Detroit from Michigan[.']"

Defendant testified that, in September 2018, he worked at Bojangles in Donelson as a cook. He explained that he had previously worked for Bojangles as a shift leader at the LaVergne location. He said that he resigned from the LaVergne restaurant, however, because of "the unprofessional practice of serving expired food[.]" Defendant explained how he began working at the Donelson location, stating, "Well, the Regional Director gave me a call and said he needed a trouble shooting person, a good person, at the Donelson location. The store hadn't even been open eight months. And gave me more money to go out there."

Defendant recalled that he worked on September 25, 2018, from 7:00 a.m. until 2:40 p.m. He explained that he was supposed to leave at 2:00 p.m. but that he worked over to "help the store out." Defendant said that he went straight home after work. Around 4:00 p.m., he went to the liquor store and purchased a pint of peach brandy and a Peach Bud Light Lime Peach-A-Rita, which he intended to share with Ms. Graham when she got home. Defendant said that he returned home and did not go out again. He stated that he did not drink any of the alcohol until Ms. Graham got home after 7:00 p.m. He recalled that Ms. Graham took a shower and that they watched The Voice television show together in the bedroom. Defendant said that both he and Ms. Graham were drinking and that they had the same amount of alcohol that night. Contradicting his earlier statement that he did not go out again that night, Defendant said that he went back to the liquor store and purchased another pint of peach brandy. He said that he and Ms. Graham shared part of the second pint of brandy.

Defendant stated that he spoke to Ms. Graham about problems he had with the new area manager and how the Donelson Bojangles had "the same existing problems [Defendant] tried to solve at [the] LaVergne [Bojangles]." Defendant explained that he cleaned out the freezer at the Donelson location that day, which took him an hour and a half. He said that he wanted to show the area manager the clean freezer but that the manager never stopped by the restaurant. When Defendant got home, he texted the area manager and told him that he cleaned out the freezer. However, the area manager responded, "[W]ell, whoopy. I mean, that's why I have got you at that location." Defendant denied that he was angry about the manager's response, stating that "it was just a careless little . . . comment." Defendant texted Ms. Graham about the conversation he had with the area manager while she was at work. She told Defendant that she would look at the messages when she got home and that it was "probably no big deal[.]"

Defendant testified that, after Ms. Graham took a shower, she asked to see the text messages. She said that it was "nothing" and that Defendant was getting "all tight up" over it. Defendant said that Ms. Graham was antagonizing him that night and telling him that he did not know what he was talking about. Defendant then spoke on the phone to the area manager in Smyrna and showed the area manager photographs he had taken of the Donelson location. He asked the manager about "how many days is the chicken good

before it's expired and you are supposed to toss it out." Defendant allowed Ms. Graham to hear the manager's answer so that Defendant could demonstrate his own knowledge about chicken. Defendant stated that he was excited when the area manager agreed with him. He said that he accidently knocked his plate of food off the kitchen counter, but Ms. Graham thought that he intentionally hit the plate. When Ms. Graham told Defendant to clean it up, he said that he would do it later and went into the bedroom. He said that Ms. Graham came into the bedroom and hit him in the right temple with her fist. Defendant stated that he stood up and attempted to exit the bedroom but that Ms. Graham would not let him out and that she was "barricading the door." When he was asked if he physically struck Ms. Graham, Defendant stated, "No, no. But she was still threatening me." He said that he made it into the den where Ms. Graham was pushing and "taunting" him. Defendant testified that he told Ms. Graham that he was going to leave and that she needed to calm down. As he went to the front door, Ms. Graham again "barricaded" the door so that Defendant could not leave. Ms. Graham told Defendant that she was "going to make [his] life miserable." He said that he went towards that back door, and Ms. Graham became "enraged." She began throwing things at Defendant, and Defendant turned the table up in an attempt to prevent Ms. Graham from following him towards the back door. Defendant stated, however, that Ms. Graham pushed the table out of the way and "put her whole body up against the back door." Defendant was again asked if he struck Ms. Graham, and he responded, "No, never. I don't hit women. God didn't make me that way. And my parents didn't raise me that way. I have never hit a woman ever in my life. Never will." Defendant agreed that the dog bit his leg, but he said that he had no injuries from the dog.

Defendant testified that he attempted to go to the front door again and that Ms. Graham began throwing pictures "one at a time . . . over [his] head to where [he] fell down in [a seated] position in the corner of the front door." He claimed that Ms. Graham hit him over the head with multiple picture frames. The following exchange then occurred:

Q. And during all of this, did you hit [Ms. Graham] back?

A. No, no, no. It just -- I mean, like I said, I don't hit. I will never hit a woman ever in my life. I was not brought up that way. It's just not in me. To me it's a coward. Any man that would do that is just a coward.

Q. Did you try to push by her?
A. I did try to push by her. But I never, never -- like, physical contact, like her statements were, never hit her. Never choked her. Never anything. Just trying to brace her away to intervene to get out of my house.

Defendant said that, when Ms. Graham tried to hit him, her thumb "got caught in [his] mouth." He said that he did not bite Ms. Graham on her face or arm and said that he did not "have a clue" how those injuries occurred. Defendant recalled that Ms. Graham

told him she was calling 911, and he responded, "[T]hank God. I'll meet them outside. I'm going outside. I need some fresh air."

Defendant said that, when officers arrived, he told them that both he and Ms. Graham had consumed alcohol. He then gave an officer a list of his prescriptions. He agreed that he was prescribed Percocet, but Defendant testified that he had not taken any that day because he had been out of the medication. He denied telling officers or EMS personnel that he had mixed Percocet with alcohol. Defendant explained that, after he bonded out of jail, he was escorted to his residence to pack a bag, and then he went to a motel in Murfreesboro for the next week. While at the motel, Defendant took photographs of his injuries. He identified the photographs and explained that they depicted injuries from "every picture being smashed over [his] head." They also showed scratches on his neck and a bruise on his arm where he claimed that Ms. Graham grabbed him and would not let go. Defendant denied taking Ms. Graham's cell phone during that evening.

On cross-examination, Defendant acknowledged that he did not tell officers that Ms. Graham hit him over the head with the pictures but explained this was because officers did not ask him. On redirect examination, the following exchange occurred:

Q. That night did you ever strike [Ms. Graham] with an open hand or a closed hand?

A. No. Just embrace for me to get out any of the doors.

Q. And did you ever strangle her?

A. No.

*Jury instructions*

At the close of proof, a discussion about the proposed jury instructions occurred outside the hearing of the jury. Defense counsel had said during opening statement that Defendant had "merely defended himself" and that Ms. Graham had been the "instigator and primary aggressor[.]" Defendant, therefore, requested that the trial court charge the jury with self-defense. The State objected, pointing out that Defendant testified that he never hit Ms. Graham. Defense counsel argued that Defendant testified that he tried to push by Ms. Graham "to get away from her." The State withdrew its objection, but the trial court stated that it would review the instruction "to see if it complies with the testimony." Upon consideration, the trial court announced:

With regard to the issue of self-defense, I've reviewed the statute on self-defense, and it looks as if the, it's up to the Court to determine whether

- 7 -

or not there's been sufficient proof that has raised the issue of self-defense, and then if there is, then the burden shifts back to the State to prove beyond a reasonable doubt that the defense does not apply.

In this particular case, I don't find any proof with regard to self-defense, any proof that any self-defense caused the injuries to the victim. Under those circumstances, the proof that was raised, I don't think is sufficient to trigger the requirement for the State to shift the burden of proof and have to put on rebuttal proof in the case. So, I'm going to deny the charge on self-defense.

During closing argument, Defendant argued that Ms. Graham instigated the fight and that she should have had more severe injuries than depicted in the photographs if her version of events was true. Following deliberations, the jury found Defendant guilty of aggravated assault and domestic assault.[1] At a subsequent hearing, the trial court sentenced Defendant, as a Range I standard offender, to concurrent sentences of three years for aggravated assault and eleven months and twenty-nine days for domestic assault. The trial court suspended the effective three-year sentence to supervised probation, following the service of thirty days in jail.

Defendant filed a timely motion for new trial, which the trial court denied in a written order following a hearing. This timely appeal follows.

**Analysis**

*1. Self-defense instruction*

Defendant contends that the trial court erred by not instructing the jury on self-defense. He asserts that the issue of self-defense was fairly raised by the evidence. He contends that, not only was the theory of self-defense presented by defense counsel in opening statement, but that the testimony from Ms. Graham, Officer Chang, and Defendant provided "significant proof" that Defendant was acting in self-defense. The State responds that, even in the light most favorable to Defendant, the proof did not support a self-defense instruction and that the trial court properly denied Defendant's request. The State further argues that, even if the trial court erred, any error was harmless beyond a reasonable doubt.

In Tennessee, the self-defense statute provides that:

---

[1] Defendant was also indicted for the offense of preventing another from making an emergency call, but the jury acquitted Defendant of that charge.

[A] person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

(A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

(B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

(C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(2) (2019). Acts committed in self-defense are justified, and self-defense is a complete defense to crimes of violence. *See* Tenn. Code Ann. § 39-11-601 (2019); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

Whether the jury instructions were proper is a mixed question of law and fact, which this court reviews de novo with no presumption of correctness. *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001). Under Tennessee law, a trial court has a duty to provide "a complete charge of the law applicable to the facts of the case." *State v. James*, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)); *see also* Tenn. R. Crim. P. 30(d)(2). This obligation "extends to general defenses, such as self-defense, defense of another, or defense of a habitation." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (footnote omitted).

When evidence adequately supporting self-defense is admitted at trial, the question of whether an individual acted in self-defense is a factual question for the jury. *See Ivy*, 868 S.W.2d at 728. However, before a trial court may submit a defense question to a jury, the proof must fairly raise an issue as to the existence of that defense, and the defendant has the burden of introducing such proof. *State v. Benson*, 600 S.W.3d 896, 903 (Tenn. 2020) (citing Tenn. Code Ann. § 39-11-203(c); *Hawkins*, 406 S.W.3d at 129). More than the slightest of evidence is necessary to fairly raise self-defense. *Id.* at 905. "The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." *Hawkins*, 406 S.W.3d at 129. In determining whether a general defense has been fairly raised by the proof, a trial court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor. *Id.* If the evidence fairly raises the issue of self-defense, the trial court is required to submit the instruction to the jury. *Id.*

Viewed in the light most favorable to Defendant, the evidence did not fairly raise the issue of self-defense in this case. Ms. Graham testified that Defendant attacked her as she attempted to reach her cell phone and that she only fought back after Defendant pushed

her down into a chair and choked her to the point that she almost lost consciousness. For his part, Defendant said that he did "try to push by" Ms. Graham to get to the front door, but he repeatedly denied Ms. Graham's claims of physical contact with her. He claimed that he did not cause any injuries to the victim. Defendant testified, "I never, never -- like, physical contact, like her statements were, never hit her. Never choked her. Never anything." He further testified, "I don't hit women. God didn't make me that way. And my parents didn't raise me that way. I have never hit a woman ever in my life. Never will." Our supreme court has held that, when a defendant denies inflicting any injury, he is not entitled to a self-defense charge. *See Green v. State*, 285 S.W. 554, 558 (Tenn. 1926) (concluding that the trial court did not err in refusing to instruct on defendant's right in self-protection to shoot at the victim where the defendant denied such shooting). This court has held likewise. *See State v. Stanley Blackwood*, No. W1999-01221-CCA-R3-CD, 2000 WL 1672343, at *9 (Tenn. Crim. App. Nov. 2, 2000) (holding that defendant was not entitled to a self-defense instruction where defendant denied that he intentionally fired his gun at anyone and, instead, claimed that he only fired his gun into the air after he was attacked), *perm. app. denied* (Tenn. May 21, 2001). Here, there was no evidentiary basis for a self-defense instruction because Defendant wholly denied Ms. Graham's claims of physical contact. Defendant's testimony did not establish that he did anything in defense of his person. At most, Defendant testified that he tried to push by Ms. Graham to get to the front door, not that he pushed her to defend himself from her. Accordingly, the trial court properly refused to instruct the jury regarding self-defense. *See e.g., Heath v. State*, 375 S.W.2d 909, 911 (Tex. Crim. App. 1964) (where a defendant testified that he did not strike or slap the victim, "nothing was done by him in defense of his person and thus the issue of self-defense was not raised"). Defendant is not entitled to relief on this issue.

## *2. Sufficiency of the evidence*

Defendant contends that the State failed to present sufficient evidence to sustain his convictions for aggravated assault and domestic assault. Defendant argues that because the self-defense instruction should have been given, the State was required to present proof to disprove self-defense beyond a reasonable doubt but that the State failed to meet this burden. Additionally, Defendant asserts that no rational trier of fact could have concluded that the victim's "minor injuries" depicted in the photographic evidence were caused by the "alleged attack testified to by the alleged victim." The State responds that Defendant was not entitled to a self-defense instruction and that, therefore, the State was not required to rebut self-defense. The State further argues that, when viewed in the light most favorable to the State, the proof is sufficient to support Defendant's convictions.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R.

App. P. 13(e).  Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh the evidence.  *Id.*  Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence."  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt.  *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  The defendant bears the burden of proving why the evidence was insufficient to support the conviction.  *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914.  On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom."  *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As charged in this case, aggravated assault occurs when a person intentionally or knowingly commits an assault, and the assault involved strangulation or attempted strangulation.  Tenn. Code Ann. § 39-13-102(a)(1)(A)(iv) (2018).  Assault occurs when a person "[i]ntentionally, knowingly, or recklessly causes bodily injury to another."  Tenn. Code Ann. § 39-13-101(a)(1) (2018).  Strangulation occurs by "intentionally or knowingly impeding normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person."  Tenn. Code Ann. § 39-13-102(a)(2) (2018).

A person commits domestic assault when he commits an assault against a domestic abuse victim, which includes an adult who lived with the defendant or an adult who had a sexual relationship with the defendant.  *See* Tenn. Code Ann. § 39-13-111(a)(2)-(3), (b) (2018).  As charged in the indictment, assault is accomplished when a defendant intentionally or knowingly causes another to reasonably fear imminent bodily injury.  Tenn. Code Ann. § 39-13-101(a)(2) (2018).  "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty."  Tenn. Code Ann. § 39-11-106(a)(2) (2018).

Here, the testimony established that Ms. Graham was Defendant's girlfriend and that they lived together at the time of the offenses.  Ms. Graham testified that, on the night of September 25, 2018, Defendant was drinking heavily and that Defendant became angry following an argument with his area manager at work.  When Defendant knocked a plate full of food onto the kitchen floor, Ms. Graham told Defendant that she was leaving.  As she attempted to get her cell phone to call family members, Defendant hit and shoved Ms. Graham and then pushed her into a chair in the living room.  Ms. Graham testified that Defendant held her down in the chair and put his hand on her throat "crushing" her airway.

Ms. Graham explained that, at the time of the offense, she was five foot, six inches and weighed 122 pounds and that Defendant was around five foot, ten inches and weighed 250 pounds. She said that Defendant was putting all his weight on her and that she could not breathe. Ms. Graham recalled that a picture frame had fallen off the wall into the chair and that Defendant was pressing her down in the glass. Ms. Graham testified that Defendant only let go of her when their dog bit Defendant on the back of the leg and that she was then able to run outside. Officer Joyner testified that Ms. Graham was crying and afraid when he initially spoke to her. Officer Joyner testified that Ms. Graham had visible injuries to her face, and Officer Chang stated that the injuries he observed to Ms. Graham were consistent with her story that Defendant had put his hands around her throat and "started squeezing until she almost lost consciousness." Moreover, Officer Chang noted that Defendant had a minor puncture wound to the back of his leg, further corroborating Ms. Graham's story. At trial, Ms. Graham also identified photographs of injuries caused by Defendant during the assault, including bite marks on her face, thumb, and arm and abrasions on her shoulder caused by glass from a broken picture frame. When viewed in the light most favorable to the State, the evidence is sufficient to support Defendant's convictions for aggravated assault and domestic assault.

As previously explained, the trial court did not err in refusing to give a self-defense instruction; therefore, the State was not required to disprove self-defense beyond a reasonable doubt. As to Defendant's remaining arguments, we reiterate that questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the jury, and we will not reweigh the evidence on appeal. *Bland*, 958 S.W.2d at 659. Defendant is not entitled to relief on this issue.

## Conclusion

Based on the foregoing, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 12 -